## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | SACV 18-2055-GW-DFMx | Date | March 9, 2020 |
|---|---|---|---|
| Title | *Uniloc 2017 LLC v. Netflix, Inc.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:    IN CHAMBERS - RULING *MARKMAN* CLAIMS CONSTRUCTION**

Attached hereto is the Court's final ruling on *Markman* Claims Construction.

Initials of Preparer    JG

*Uniloc 2017 LLC v. Netflix, Inc.*, 8:18-cv-02055 GW (DFMx)
*Uniloc 2017 LLC v. Netflix, Inc.*, 8:18-cv-02150 GW (DFMx)
Final Rulings on *Markman* Claims Construction

## I.   Introduction

Uniloc 2017 LLC ("Uniloc") has filed two cases for patent infringement against Netflix, Inc. ("Netflix"), alleging infringement of four U.S. Patents.  Case No. 18-cv-2055, Docket No. 22 (First Amended Complaint as to Netflix regarding two of four asserted patents); Case No. 18-cv-2150, Docket No. 23 (First Amended Complaint as to Netflix regarding two of four asserted patents).

The parties have submitted a Joint Claim Construction and Prehearing Statement.  Docket No. 82.  They have also filed Opening Claim Construction Briefs (Docket Nos. 92, 93) and Responsive Claim Construction Briefs (Docket Nos. 100, 101).

A technology tutorial was held on January 16, 2020 and a claim construction hearing was held on February 13, 2020.[1]  Docket Nos. 119, 136.

The Court would construe the presented disputed terms as stated herein.

## II.   Background

The following patents are currently asserted in this case:

- U.S. Patent No. 6,584,229 ("the '229 Patent");
- U.S. Patent No. 6,895,118 ("the '118 Patent");
- U.S. Patent No. 9,721,273 ("the '273 Patent"); and
- U.S. Patent No. 8,407,609 ("the '609 Patent").

*See* Docket No. 82 at 1.

### A.  The '229 Patent

The '229 Patent issued June 24, 2003 and is titled "Macroblock-Based Object-Oriented Coding Method of Image Sequence Having a Stationary Background."

Claim 1 is the only independent claim of the '229 Patent.  It recites:

> 1.   A method, for use in an macroblock-based object oriented coding of a image signal, wherein the image signal has a stationary background region and an object region and contains a current frame and a previous frame, each frame including a plurality of macroblocks, comprising the steps of:

---

[1] At the hearing, the Court provided the parties with a tentative ruling stating its views regarding the construction of the disputed claim terms.  Docket No. 136.

a) dividing the stationary background region and the object region from an inputted video in a macroblock-by-macroblock basis by using a difference between the previous frame and the current frame;

b) coding shape information of the object region by using a known coding technique to generate coded shape information;

c) coding pixel information of each macroblock contained in the object region by using a selected known coding technique to generate coded object pixel information;

d) generating coded pixel information of a previous frame macroblock corresponding to each current frame macroblock contained in the stationary background region as coded stationary pixel information; and

e) storing or transmitting coded data coded shape information, coded object pixel information and coded stationary pixel information as coded image signal, and

wherein the step d) includes the step of reusing corresponding coded pixel information macroblock contained in the previous frame without coding the pixel information of each macroblock contained in the current frame when a difference between a pixel value of the macroblock of the current frame and that of the macroblock of the previous frame in the same position is identical to or smaller than a predetermined threshold value.

### B.  The '118 Patent

The '118 Patent is titled "Method of Coding Digital Image Based on Error Concealment." It issued on May 17, 2005.

Claim 1 recites:

1. A method of coding a digital image comprising macroblocks in a binary data stream, the method comprising:
an estimation step, for macroblocks, of a capacity to be reconstructed via an error concealment method,
a decision step for macroblocks to be excluded from the coding, a decision to exclude a macroblock from coding being made on the basis of the capacity of such macroblock to be reconstructed,
characterized in that it also includes a step of inserting a resynchronization marker into the binary data stream after the exclusion of one or more macroblocks.

The '118 Patent includes four other independent claims besides Claim 1, and five dependent claims.

### C.  The '273 Patent

The '273 Patent is titled "System and Method for Aggregating and Providing Audio and Visual Presentations via a Computer Network."  It issued on August 1, 2017.

2

Claim 1 recites:

1.   A method for providing content via a computer network and computing system, the method comprising:

storing presentation data that represents content of a first collection of one or more presentations using the computer system;

storing data indicative of the first collection of presentations so as to be associated with the presentation data;

storing feed data that represents a collection of one or more feeds using the computer system, wherein each of the feeds identifies a corresponding second collection of one or more presentations being accessible via the computer network and includes no data representing content of the second collection of presentations;

automatically and periodically accessing each of the feeds to identify each of the corresponding second collection of presentations, using the computer system;

storing data associated with a third collection of one or more presentations; and

aggregating each of the first, identified second, and third collections of presentations for delivery via the computer network using a common web page.

The '273 Patent has just three claims.  Claim 2 is also an independent claim.  It includes substantially the same limitations as Claim 1, but the preamble styles the claim as relating to "[a] non-transitory computer readable medium" that includes "computer instructions" configured to cause the computer to execute the claimed steps.  Claim 3 is a dependent claim that depends from Claim 2.  *See* '273 Patent, Claim 3 ("The computer readable medium of claim 2, wherein the computer comprises at least one web server, at least one database server and at least one file server.").

**D.  The '609 Patent**

The '609 Patent issued March 26, 2013 and is titled "System and Method for Providing and Tracking the Provision of Audio and Visual Presentations Via a Computer Network."

Claim 1 recites:

1. A method for tracking digital media presentations delivered from a first computer system to a user's computer via a network comprising:

providing a corresponding web page to the user's computer for each digital media presentation to be delivered using the first computer system;

providing identifier data to the user's computer using the first computer system;

providing an applet to the user's computer for each digital media presentation to be delivered using the first computer system,

3

> wherein the applet is operative by the user's computer as a timer;
>
> receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a predetermined temporal period elapses using the first computer system; and
>
> storing data indicative of the received at least portion of the identifier data using the first computer system;
>
> wherein each provided webpage causes corresponding digital media presentation data to be streamed from a second computer system distinct from the first computer system directly to the user's computer independent of the first computer system;
>
> wherein the stored data is indicative of an amount of time the digital media presentation data is streamed from the second computer system to the user's computer; and
>
> wherein each stored data is together indicative of a cumulative time the corresponding web page was displayed by the user's computer.

The '609 Patent has three claims, with Claim 1 being its only independent claim. Claims 2 and 3 depend from Claim 1 and add:

> 2.  The method of claim 1, wherein the storing comprises incrementing a stored value dependently upon the receiving.
>
> 3.  The method of claim 2, wherein the received data is indicative of a temporal cycle passing.

## III.  **Legal Standard**

Claim construction is an interpretive issue "exclusively within the province of the court." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). It is "a question of law in the way that we treat document construction as a question of law," with subsidiary fact-finding that is reviewed for clear error. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 837-40 (2015). The claim language itself is the best guide to the meaning of a claim term. *See Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014). This is because the claims define the scope of the claimed invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). But a "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent." *Id.* at 1313. Thus, claims "must be read in view of the specification," which is "always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1315 (internal quotations omitted).

Although claims are read in light of the specification, limitations from the specification

must not be imported into the claims.  *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009).  "[T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."  *Phillips*, 415 F.3d at 1323.

The prosecution history is "another established source of intrinsic evidence."  *Vederi*, 744 F.3d at 1382.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  *Phillips*, 415 F.3d at 1317 (citations omitted).  "Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent."  *Id.*  "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*

Claim construction usually involves resolving disputes about the "ordinary and customary meaning" that the words of the claim would have had "to a person of ordinary skill in the art in question at the time of the invention."  *Phillips*, 415 F.3d at 1312-13 (internal quotations and citations omitted).  But in some cases, claim terms will not be given their ordinary meaning because the specification defines the term to mean something else.  "[A] claim term may be clearly redefined without an explicit statement of redefinition," so long as a person of skill in the art can ascertain the definition by a reading of the patent documents.  *Id.* at 1320; *see also Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1364 (Fed. Cir. 2016).

Where the patent itself does not make clear the meaning of a claim term, courts may look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the prosecution history and "extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Phillips*, 415 F.3d at 1314 (internal quotations omitted).  Sometimes, the use of "technical words or phrases not commonly understood" may give rise to a factual dispute, the determination of which will precede the ultimate legal question of the significance of the facts to the construction "in the context of the specific patent claim under review."  *Teva*, 135 S. Ct. at 841, 849.  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases

involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id.*

## IV.   Discussion

### A.  Agreed Claim Terms

The parties have agreed to constructions for the following terms:

| Term | Agreed Construction |
|---|---|
| "coded data coded shape information, coded objection pixel information and coded stationary pixel information" ('229 Patent, Claim 1) | "coded data including coded shape information, coded object pixel information and coded stationary pixel information" |
| "quantum-transformation" ('229 Patent, Claim 5) | "quantization" |
| "a first collection of one or more presentations" ('273 Patent, Claim 1) | "a collection of one or more presentations identified independent of any feed" |
| "feed data that represents a collection of one or more feeds" ('273 Patent, Claim 1) | "data that identifies or provides for access to one or more feeds" |
| "streamed" ('609 Patent, Claim 1) | "transferred via a technique such that the data can be processed as a substantially steady or continuous sequence" |

*See* Docket No. 82; *see also* Docket No. 92 at 14 (Uniloc's Opening Claim Construction Brief, adopting Netflix's amended proposed construction for the term "streamed").

### B.  Disputed Claim Terms

Before addressing the parties' individual disputes, a few preliminary comments are warranted. The Court has often analogized patent litigation to a game of chess. Each party is planning its moves at least three steps ahead. And in this case, the parties have certainly made it clear that they have no interest in sharing their future moves.

It is often this Court's practice to require the parties to disclose their future moves at the claim construction stage. The Court commonly directs parties to disclose the impact, if any, that selecting a parties' proposed construction will have on dispositive issues in the case such as infringement and invalidity. The Court is not prejudging the ultimate infringement analysis, but simply finds that often, this information provides helpful technical context and a deeper practical

understanding of the complex technological concepts at issue. *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326–27 (Fed. Cir. 2006) ("While a trial court should certainly not prejudge the ultimate infringement analysis by construing claims with an aim to include or exclude an accused product or process, knowledge of that product or process provides meaningful context for the first step of the infringement analysis, claim construction.").

Particularly in this case, the highly technical disputes raised by the parties have been presented – from the Court's vantage point – in a vacuum. In some instances, it is not even clear that the parties have a relevant substantive dispute as opposed to a semantic one. The Court has reviewed the parties' disputes and provides its position herein regarding the scope of the disputed claim terms. The Court would prefer that all relevant disputes regarding the scope of the presented claim terms be addressed now, but in places in this Order, it has noted the lack of sufficient context to support limiting the meaning of a term at this time. The parties were expected at the hearing to provide further, particularized context on these issues (simply saying "the accused product does not infringe if this limitation is construed as Netflix proposes" is not enough).

    1.  '118 Patent Claim Disputes

- "resynchronization marker" ('118 Patent, Claims 1, 4, 6, 7, 8)

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
| --- | --- |
| "a number of bits in a data stream that cause reconstruction to occur for an excluded macroblock, not including a flag useful only for regions having a motion vector close to zero and for which the texture has not significantly changed" | "a sequence of bits that can be detected by a receiver when an error occurs in order to start reading the data stream again at that location" |

- Alleged disclaimer in '118 Patent specification at column 4, lines 47-65

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
| --- | --- |
| This is not a claim element; *see* "resynchronization marker" | "the exclusion of macroblocks from coding according to the invention does not entail the insertion of any specific flag and the exclusion of macroblocks from coding is thus possible for all modes of I, P or B coding" |

The parties state that they have two claim construction disputes for the '118 Patent, but only one of those disputes involves a claim term ("resynchronization marker"). The other dispute relates to whether there is a disclaimer of claim scope in an excerpt of the '118 Patent specification.

In describing steps of a flow chart depicted in Figure 1, the '118 Patent states:

> . . . In step BC, the bits are counted to trigger the insertion of a resynchronization marker in a step MARK when the video packet is of sufficient size. After each step EXC, a resynchronization marker is inserted into the binary data stream in step MARK. ***Here, the term "synchronization marker" must be interpreted generally to include, for example in the MPEG-4 standard, such conventional markers as RESYNC, VOPStart (start of a temporal instance (plan) of a video object), GOVStart (start of a group of temporal instances of a video object), EOS (end of video session).*** At the end of the method a binary data stream BIN is thus obtained.
>
> . . . .
>
> It should be noted that the MPEG-4 standard already proposes not to code certain macroblocks in a video object or, more generally, in a video image, indicating this absence of coding by the presence of an "uncoded" flag. The presence of this flag is interpreted by the decoders which replace the uncoded macroblock with the macroblock located in the same position in a preceding instance of the video object. In general, the instance immediately preceding the instance in question is used. As a consequence, this ["uncoded"] flag can only be used for P coded images, for which a preceding instance is available and implicitly echoed in B coded images. ***The insertion of a flag of this nature is therefore only useful for regions having a motion vector close to zero and for which the texture has not changed significantly from one image or instance to the next. The exclusion of macroblocks from coding according to the invention does not entail the insertion of any specific flag and the exclusion of macroblocks from coding is thus possible for all modes of I, P or B coding.***

'118 Patent, 4:29-65 (emphasis added).

Uniloc argues that its proposed construction for "resynchronization marker" aligns with this disclosure. Uniloc defines a resynchronization marker in terms of its ability to serve as a placeholder for a macroblock that has been removed from a data stream, rather than specifying or implying a particular type of previously-known resynchronization marker. Uniloc's proposed construction further includes the phrase "not including a flag useful only for regions having a motion vector close to zero and for which the texture has not significantly changed." This aspect of Uniloc's proposal is based on the second quoted paragraph, which disclaims "uncoded" flags that were previously known in the MPEG-4 standard.

8

Netflix argues that its proposed construction of "resynchronization marker" is based on the known and conventional meaning of the term "resynchronization marker" at the time the patent was filed.  Netflix bases its proposal on a portion of the "Description" section of the '118 Patent describing prior art concepts, which states:

> The MPEG-4 standard defines a coding syntax and proposes a certain number of tools for managing transmission errors . . . . Among these tools the MPEG-4 standard proposes tools for resynchronizing the binary data stream which periodically insert resynchronization markers into the data stream. These markers are used by the receiver which is resynchronized thanks to them during decoding. ***When an error occurs in the data stream, the receiver cannot read the data any more until it detects a subsequent resynchronization marker***. The set formed by the marker and data between this marker and the following marker, is called a video packet. The resynchronization marker is included in a header element of the video packet. The header element also contains the number of the first macroblock of the video packet, to allow spatial resynchronization, and parameters that permit the receiver to continue decoding. The numbers of the subsequent macroblocks are not present in the data stream. Resynchronization as defined in the MPEG-4 standard can thus be qualified as point resynchronization, because it only exists for certain items of data in a stream, the rest of the stream being . . . .
>
> It is an object of the present invention to suggest a coding method that includes an exclusion of macroblocks having a certain capacity to be reconstructed from the coding compatible with coding standards which include point resynchronization means.

'118 Patent at 1:35-51 (emphasis added).  Netflix separately argues that there is a disclaimer of claim scope in the patent specification, but does not tie its proposed disclaimer arguments to a particular claim limitation in the asserted claims of the '118 Patent.  Netflix focuses on a different sentence of the specification compared to the portion that Uniloc acknowledges as a disclaimer.  Specifically, Netflix refers to the sentence in the specification stating: "The exclusion of macroblocks from coding according to the invention does not entail the insertion of any specific flag and the exclusion of macroblocks from coding is thus possible for all modes of I, P or B coding." '118 Patent at 4:61-65.

         a)     *Meaning of "Resynchronization Marker"*

Netflix's arguments regarding the meaning of the term "resynchronization marker" are not persuasive.  The '118 Patent discusses and purports to address shortcomings with the tools previously available in the MPEG-4 standard for coding a digital image, including the previously-known "resynchronization markers."  In explaining an "object of the invention," the

'118 Patent discusses inserting resynchronization markers after the exclusion of one or more macroblocks so that the excluded macroblocks can be "reconstructed." '118 Patent at 2:1-10. Elsewhere, the '118 Patent states that "the term 'synchronization marker' must be interpreted generally to include, for example in the MPEG-4 standard, such conventional markers as RESYNC, VOPStart (start of a temporal instance (plan) of a video object), GOVStart (start of a group of temporal instances of a video object), EOS (end of video session)."[2] *Id.* at 4:35-42. This discussion of the use of resynchronization markers is different from the characterization of previous uses of resynchronization markers as solely allowing a receiver to "resynchronize" with a data stream after an error occurred in the data stream that prevented the receiver from being able to read the data. *Id.* at 1:41-46. Uniloc presents testimony from its expert that the previously-known uses of resynchronization markers in the context of the MPEG-4 standard would solely be referred to as "RESYNC" markers, and notes that this is merely one of various exemplary types of known markers that the patent specification itself lists as performing the role of "synchronization markers" within the scope of the claims. *See* Deposition of Dan Schonfeld, October 16, 2019, Docket No. 100-4 at 21:6-23.

At the hearing, Netflix reiterated its position that the focus of the '118 Patent is to take something known in the prior art (resynchronization markers) and use it "as the signal that macroblocks have been excluded." Claim Construction Hearing Transcript ("Tr."), Docket No. 130 at 5:11-12; *see also id.* at 7:9-13 (". . . they are taking this thing that exists in the standard, but they are using it for a different purpose than it's normally used for."). Netflix argued that in the context of the '118 Patent, the resynchronization marker continues to serve its known, prior art purpose of error recovery, but additionally serves a second purpose of being a macroblock placeholder. *Id.* at 8:5-11. Netflix strongly urged that claim terms should not be construed "just by describing what they are used for in an invention," but instead by adopting their ordinary and customary meaning, absent other circumstances. *Id.* at 9:17-20. Netflix further cited to extrinsic evidence to argue that its proposed construction did not exclude the other "synchronization

---

[2] There appears to be no dispute from Netflix that even though this excerpt of the patent specification refers to a "synchronization marker," the patent applicant intended that phrase to be used interchangeably with the phrase "resynchronization marker." *See also* Tr. 12:10-17 (Uniloc stating that "synchronization" and "resynchronization" terms are being used synonymously); Tr. 15:5-6 (Netflix asserting that VOP start code was known as a prior art resynchronization marker); Tr. 16:8-13.

markers" cited in the patent specification.

As Uniloc noted in response, nothing in the claim language itself requires that the resynchronization marker be used for "error resilience" (Tr. 12:4-9). Uniloc reiterated the fact that the patent specification refers to VOPStart, GOVStart, and EOS as other resynchronization markers, even though its expert had testified they are not related to "error resilience." Uniloc noted that even though Netflix disagreed with Uniloc's arguments and characterizations regarding these other marker types, the only expert testimony on the record supported its position regarding this characterization of VOPStart, GOVStart, and EOS.

After the hearing, Netflix filed a notice of supplemental authority, attaching a claim construction order from the Eastern District of Texas construing the term "resynchronization marker" in the '118 Patent. *See Uniloc 2017 LLC v. Verizon Comm'ns, Inc.*, Case No. 2:18-cv-00536 JRG (E.D. Tex. Feb. 17, 2020) ("*E.D. Tex. Order*," available at Docket No. 135-1). The E.D. Tex. Order stated, *inter alia*,

> The issue in dispute is whether the "resynchronization marker" of the claims should be defined by its ability to enable resynchronization of the system when macroblocks are dropped due to an error condition or by its ability to enable reconstruction of the macroblocks that were intentional excluded from the data stream . . . .
> The court rejects Defendants' proposed construction because its focus on resynchronization on an error condition fails to clarify the claim scope and threatens to inject limitations not supported by the disclosure of the '118 Patent. The Court agrees with Defendants that "resynchronization marker" is used in the '118 Patent to refer to prior-art markers that serve as synchronization points for resynchronizing the decoder with the data stream on an error condition. [citation to patent omitted]. ***That said, the patent also suggests a <u>broader</u> use of "resynchronization marker" by describing the "resynchronization marker" placed in the data stream to denote excluded marcoblocks*** . . . .

*Id.* at \*12-13 (emphasis added). The E.D. Tex. Order then provides a detailed review of the extrinsic evidence that was presented to it with respect to the term "resynchronization marker" and concludes that the term "has both a broad and a narrow meaning in the art and Defendants' proposed construction raises a number of potential scope issues while clarifying little." *Id.* at \*15. The E.D. Tex. Order goes on to state,

> [i]n context, the Court understands "resynchronization marker" to have a broad meaning referring to resynchronization capabilities and not necessarily to error conditions . . . . [T]he Court understands that "resynchronization marker" is used in a broad sense to encompass

conventional markers such as RESYNC, VOPStart, GOVStart, and EOS, ***based on their resynchronization capabilities regardless of error-processing capabilities***.

*Id.* (emphasis added).  The E.D. Tex. Order rejected both parties' proposed constructions for the term and construed it as "sequence of bits in a data stream that can serve as a resynchronization point and an error-concealment-reconstruction point of excluded macroblock(s) for all modes of coding."  *Id.* at *17.

The Court finds the detailed analysis conducted in the E.D. Tex. Order helpful and persuasive in its review of this term, particularly because it is clear the parties presented the E.D. Tex. court with additional extrinsic evidence providing context regarding the known meaning(s) of the term "resynchronization marker" at the time of the invention.  The Court agrees that as claimed, the term "resynchronization marker" at least encompasses conventional prior art markers such as RESYNC, VOPStart, GOVStart, and EOS.  The Court also agrees that the term is not properly defined in the error-processing terms Netflix proposes, *i.e.* for detecting "by a receiver when an error occurs in order to start reading the data stream again at that location."

The Court, however, does not find a basis to adopt the portion of the E.D. Tex. Order's construction for "***an error-concealment***-reconstruction point."  *See E.D. Tex. Order* at *17.  The sole basis for the insertion of this phrase is Claim 1 of the '118 Patent and the '118 Patent Abstract.  *See id.* at *16.  Thus, this phrase is admittedly redundant of limitations that already appear in at least some of the claims and would not add any clarity about the meaning of the term to a jury.  The Court addresses the final part of the E.D. Tex. Order's construction, "for all modes of coding," in the next section.

b)    *Alleged '118 Patent Specification Disclaimer*

Regarding an alleged disclaimer in the '118 Patent, the parties appear to at least agree that the specification disclaims the use of previously-known, "uncoded" flags that were "only useful for regions having a motion vector close to zero and for which the texture has not changed significantly from one image or instance to the next."  '118 Patent at 4:58-61.  The parties instead dispute the import of the next sentence in the specification, which states: "The exclusion of macroblocks from coding according to the invention does not entail the insertion of any specific flag and the exclusion of macroblocks from coding is thus possible for all modes of I, P or B coding."  *Id.* at 61-65.

Although Netflix disputes that this issue should be considered in the context of the claim

term "resynchronization marker," Netflix does not cite legal authority to support construing an entire claim set based on an alleged disclaimer in the specification, with the alleged disclaimer untethered to any specific claim language.  Further, although the relevant paragraph of the specification ('118 Patent at 4:47-65) does not mention "resynchronization markers" by name, it is not reasonably disputable that the paragraph discusses similar concepts to those discussed throughout the specification about inserting placeholders in a data stream to permit subsequent reconstruction of excluded data.

In the E.D. Tex. Order, the court rejected Uniloc's proposal regarding uncoded flags, finding that "the negative limitation excluding flags useful only for regions having a motion vector close to zero and for which the texture has not significantly changed is in some respects too narrow, and . . . gives no effect to 'resynchronization.'"  *E.D. Tex. Order* at *15.  The E.D. Tex. Order interpreted the specification at column 4, lines 47-65,[3] stating,

> [t]his explains that the "resynchronization marker" of the patent does not encompass a "flag [that] can only be used for P coded images" but rather encompasses only markers that can be used "for all modes of I, P or B coding."  Given the juxtaposition of "only . . . P coded images" with "all modes of I, P or B coding," Plaintiff's argument that "all modes of I, P or B coding" effectively means that a "resynchronization marker" must merely be able to handle all modes of one coding type (e.g., only P coding) is not persuasive.

---

[3] For reference, again, this paragraph of the '118 Patent specification states:

> It should be noted that the MPEG-4 standard already proposes not to code certain macroblocks in a video object or, more generally, in a video image, indicating this absence of coding by the presence of an "uncoded" flag. The presence of this flag is interpreted by the decoders which replace the uncoded macroblock with the macroblock located in the same position in a preceding instance of the video object. In general, the instance immediately preceding the instance in question is used. As a consequence, this ["uncoded"] flag can only be used for P coded images, for which a preceding instance is available and implicitly echoed in B coded images. The insertion of a flag of this nature is therefore only useful for regions having a motion vector close to zero and for which the texture has not changed significantly from one image or instance to the next. The exclusion of macroblocks from coding according to the invention does not entail the insertion of any specific flag and the exclusion of macroblocks from coding is thus possible for all modes of I, P or B coding.

'118 Patent, 4:47-65.

*Id.* at \*16.  The Court finds the E.D. Tex. Order's analysis of the specification persuasive, and similarly finds its addition of the phrase "for all modes of coding" in its construction much easier to understand than the competing proposals provided by the parties.

The term "resynchronization marker" is construed as "sequence of bits in a data stream that can serve as a resynchronization point and an reconstruction point of excluded macroblock(s) for all modes of coding."

    2.   "computer system" ('609 Patent, Claim 1)

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "a single computing device or a collection of computing devices having a common operator or under common control" |

The parties dispute whether the term "computer system" is lexicographically defined in the '609 Patent specification.

The '609 Patent states, "[t]he terms 'computer,' 'computer device['] and/or 'computer system' as used herein may generally take the form of single computing devices or collections of computing devices having a common operator or under common control." '609 Patent, 3:52-55. Netflix argues that this sentence controls the scope of the phrase "control system," and further argues that its position is supported by other passages in the specification. *See* Docket No. 101 at 6 (citing '609 Patent at 3:52-55, 8:38-42, 12:50-55, 12:64-66).  Uniloc disputes that this statement in the specification is a definition, emphasizing that it uses the phrase "may generally." Uniloc argues that a computer system need not include computing devices that all have a common operator or are under common control.  Uniloc's expert, Michael Shamos, asserts that, "the fact that multiple computers are under common control does *not* make them part of the same 'computer system' . . . . For example, the IBM Corporation owns computers all over the world, but no one would say they are all part of the same 'computer system.'"  Declaration of Dr. Michael Shamos in Support of Uniloc's Opening Claim Construction Brief, Docket No. 92-4 ¶ 34 (emphasis in original).  He further states, "[i]n any 'system,' the components interoperate.  In a client/server system, for example, the client (e.g. a user's laptop) and a server (e.g. a web server at amazon.com) form a system because they communicate and interoperate, but they do not have a common operator and are not under common control." *Id.* ¶ 35.

The Court agrees with Uniloc that the specification's statement that a computer system

"as used herein may generally take the form of . . . collections of computing devices having a common operator or under common control" is not definitional. The phrase "may generally" does not reflect an intent by the patent applicant to definitively limit the meaning of the term "computer system." Further, Figures 1 and 7 are described as showing "system[s] of networked computers." Both figures depict a collection of both personal computers and servers in a network. '609 Patent at 3:65-66 ("Referring now to FIG. 1, there is shown a block diagram of a system of networked computers **10**. The illustrated system **10** includes a plurality of user computers **20**, a plurality of network server computers **30** and a network **40** interconnecting computers **20**, **30** together."); *id.* at 8:37-52. The specification's use of the phrase "system of networked computers" in this context undercuts an argument that the specification limited the meaning of the phrase "computer system" to a collection of computing devices commonly operated or controlled.

Netflix cites to a passage of the specification that distinguishes between "an operator's system" and "a third party's computer system" to support its position that "computer system" requires a commonly operated or controlled collection of computing devices. *See* '609 Patent at 12:36-55; *see, e.g. id.* at 12:46-50 ("in certain embodiments of the present invention, aggregated content playback may advantageously be tracked in a substantially same manner, regardless of whether it is streamed from system **30** or otherwise unrelated computer systems operated by third parties."). Although this embodiment indeed appears to use the phrase "computer system" in the manner Netflix proposes, it provides an insufficient basis to limit the meaning of the claim phrase given the other disclosure in the specification.

The Court does not construe the term "computer system" at this time.

3. "each stored data is together indicative of a cumulative time the corresponding web page was displayed by the user's computer" ('609 Patent, Claim 1)

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, *i.e.*, "the stored data collectively is indicative of a cumulative time the corresponding web page was displayed by the user's computer" | "the total time the corresponding web page was displayed by the user's computer is determined from two or more stored data entries" |

The parties dispute whether the intrinsic record, including the prosecution history, places limits on the meaning of the claim term "each stored data is together indicative of a cumulative

time the corresponding web page was displayed by the user's computer."

During prosecution, the patent applicant distinguished the proposed claims from a patent application to "Cobley." *See* Response to Notice of Non-Compliant Amendment, September 6, 2012, Docket No. 93-18 at 5. The patent applicant stated:

> . . . . Cobley discloses a random determination made by an accounting system for a webs server is of a time period for which a customer must have an advertiser's page loaded in their browser before receiving a credit reward. The randomly determined time is returned to a main script for the web server and then used to set up a timing applet that is embedded in a two-frame page which the script for the web server causes to be returned to the workstation. . . . . Provided this two-frame page remains loaded for the timing period of the applet (that is, the randomly determined time period) the timing applet is arranged to send a message back to the server 25 causing a credit allocation to the customer (for example, via the execution of an appropriate script) . . . .

> *Cobley's timing applet sends only a <u>single</u> message back to the web server 25, and that message is <u>not</u> indicative of a cumulative time that the advertiser's page was displayed*. [Cobley's] timing applet sends a message back to the server 25 if the two-frame page remains loaded for the timing period of the applet. *Cobley does not teach or suggest that the timing applet sends any additional message for any additional period after the timing period [of] the applet elapses.* Indeed, the timing applet of Cobley is concerned with only the <u>minimum</u> loaded period of the advertiser's page that is required before the customer is allocated and reward and, therefore, need only send the message <u>once</u> after the minimum timing period has passed. *Cobley's message sent from the timing application is therefore <u>not</u> indicative of <u>a cumulative time</u> the corresponding web page was displayed by the user's computer.* To the contrary, it is indicative of the minimum loaded period of the advertiser's page that is required before the customer is allocated a reward. Moreover, Cobley does not teach or suggest any additional timing period or sending any additional message after the sole timing period elapses. *For example, the customer in Cobley might view the advertiser's page for a longer time period than the timing period of the timing applet, but the timing applet will return only the single message indicating that the minimum loaded period has been met. Cobley's timing applet does not provide for data indicative of a cumulative time the corresponding web page was displayed by the user's computer to be stored at the web server 25.* To the contrary, Cobley tracks what pages the customer loads to determine how long they retain pages from the advertiser's website (see para. 26 of Cobley). Cobley thus fails to teach or suggest 'receiving at least a portion of the identifier data from the user's computer responsively to the timer applet each time a predetermined temporal period elapses using the first computer system,' 'storing data

indicative of the received at least portion of the identifier data using the first computer system' and 'wherein each stored data is together indicative of a cumulative time the corresponding web page was displayed by the user's computer', as now expressly recited by Applicant's amended independent claim 1.

*Id.* at 5-7 (underlining in original, all other emphasis added).

Netflix challenges Uniloc's interpretation as "incorrectly allow[ing] a single data entry to satisfy the claim limitation." Docket No. 101 at 6. Netflix argues that "the claimed 'cumulative time' must be calculated from multiple data entries." *Id.* Uniloc does not appear to dispute that Cobley discloses a timing applet that sends only a single message back to the web server. Docket No. 100 at 6. Uniloc argues that in comparison, "[t]he 'applet' of claim 1 sends data each time a predetermined period elapses, not once, but continuously as a user remains on the webpage . . . . Each stored time represents the current total time at the time of transmission, and collectively they indicate the cumulative time over time." *Id.*

At the hearing, Netflix emphasized another aspect of the prosecution history. Netflix noted that a proposed dependent claim had already included the phrase "each stored data is indicative of a cumulative time the corresponding web page was displayed by the user's computer" when the examiner rejected the claims over Cobley. The applicant responded by incorporating the claim limitation "each stored data is ***together*** indicative of a cumulative time the corresponding web page was displayed by the user's computer" into the independent claim. According to Netflix, the addition of the word "together," a word that would only practically make sense in the context of two or more stored data entries, supported a construction of the claim phrase as requiring two or more stored data entries. Uniloc responded that claim limitation was "not designed to account for this boundary situation." Tr. at 37:14-15.

But contrary to Uniloc's position the "boundary situation" is exactly what was being discussed in the prosecution history in the context of distinguishing Cobley. The Court agrees with Uniloc that there are various ways that Cobley could have been distinguished from the proposed claims. By opting to incorporate the phrase "***together*** indicative of a cumulative time . . . ," into the claims, the applicant differentiated the claims from Cobley in a way that signaled a requirement for multiple time data entries. *Tech. Properties Ltd. LLC v. Huawei Techs. Co.*, 849 F.3d 1349, 1359 (Fed. Cir. 2017) ("the scope of surrender is not limited to what is absolutely necessary to avoid a prior art reference; patentees may surrender more than necessary."). If not, the word "together" would not be given any effect. *Akzo Nobel Coatings, Inc. v. Dow Chem.*

17

*Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (construction that rendered word in a claim superfluous rejected).

It is unclear if the parties have a separate dispute for this term related to whether there are limits on how the cumulative time is calculated. Theoretically, a "stored data" could notate just the "predetermined period of time" itself (fifteen seconds, for instance), even for later instances of data being stored. Together, all the fifteen-second stored data points could be summed and indicative of the cumulative time. Or alternatively, and also theoretically, a "stored data" could itself notate the cumulative time (sixty seconds, for instance, if the stored data in question was the fourth instance of data being stored, or the actual time on a clock, which could then have the start time subtracted from it to determine total time). In this example, each single stored data is itself indicative of the cumulative time. Netflix's proposed construction ("the total time . . . is determined from two or more stored data entries"), as well as Uniloc's example in its responsive claim construction brief, appear to track the latter scenario, while the phrasing of Uniloc's proposed construction ("the stored data *collectively* is indicative of a cumulative time . . .") suggests the former scenario. *See* Docket No. 100 at 6 ("Take an example where the claimed applet transmits the elapsed time every 30 seconds (*e.g.*, 30, 60, 90, 120, 150, *et seq.*) and a server receives and stores the times."). There is insufficient information on the current record to show that the parties even have a dispute surrounding this issue that is relevant to questions like infringement and/or invalidity, let alone sufficient information for the Court to resolve any such dispute. It is also unclear to the Court why both could not be covered by the claim language.

The Court construes the term "each stored data is together indicative of a cumulative time the corresponding web page was displayed by the user's computer" as "there are two or more stored data that are indicative of a cumulative time the corresponding web page was displayed by the user's computer."

    4. "presentation data" Terms

- "presentation data that represents content of a first collection of . . . presentations" / "data representing content of the second collection of presentations" ('273 Patent, Claims 1, 2)

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| "data that represents to a user content of a first / second collection of [. . .] presentations" | "the data, or a portion of the data, of the audiovisual content itself within the first / second collection of presentations" |

- "data indicative of the first collection of presentations so as to be associated with the presentation data" ('273 Patent, Claim 1, 2)

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain and ordinary meaning, *i.e.*, "data associating the first collection of presentations with the presentation data" | "metadata describing or categorizing the audiovisual content of the first collection" |

Claim 1 of the '273 Patent states:

1. A method for providing content via a computer network and computing system, the method comprising:
    storing *presentation data that represents content of a first collection of one or more presentations* using the computer system;
    storing *data indicative of the first collection of presentations so as to be associated with the presentation data*;
    storing feed data that represents a collection of one or more feeds using the computer system, wherein each of the feeds identifies a corresponding second collection of one or more presentations being accessible via the computer network and includes no *data representing content of the second collection of presentations*[.]

'273 Patent at Claim 1 (emphasis added).  Claim 2 includes the same emphasized limitations.

Regarding the terms "presentation data that represents content of a first collection of . . . presentations" and "data representing content of the second collection of presentations," the parties dispute whether the phrase "data representing content" is limited to the content itself or also describes a broader category of data, such as "particular content information **240**."  *See* Docket No. 92 at 18.

The '273 Patent states that "particular content information **240**," as well as "particular content graphics **230**" and "particular content type indicators **235**" are "organized to indicate individual presentations . . . . A user may select such a presentation for display by selecting an individual presentation for streaming or downloading, such as by clicking on an indicator **235**, **240** or **245**."  '273 Patent at 5:16-23.  Uniloc argues that the phrase "data representing content" should be construed so that it is broad enough to cover, for example, "particular content information **240**" because "particular content information **240**" "represent[s] content to a user to allow the user to make an informed decision as to whether to stream the associated content."  Docket No. 92 at 18.  Netflix argues that construing the term "data representing content" so broadly would render the next limitation in the claims, "storing data indicative of the first

collection of presentations so as to be associated with the presentation data," superfluous. Docket No. 101 at 7-8.  The Court agrees with Netflix on this point.  Under Uniloc's proposal, the phrase "presentation data that represents content" would have effectively the same scope as the phrase "data indicative of the first collection of presentations."  It would be improper to interpret the phrase in such a way, and render the next phrase in the same claim entirely redundant and superfluous.

At the hearing, Uniloc stated its position that the two claim terms do not have exactly the same meaning under its proposed constructions, but simply overlapping meaning.  Uniloc stated, for instance, that "presentation data that represents content" might include "MPAA ratings" (whether a movie is rated "r" or "pg"), and "data indicative of the first collection of presentations" might include file information, url, and content ID.  According to Uniloc, both might cover the title, description, content graphics, and content itself.  Uniloc argued, "[s]o . . . long as we have two different pieces of data that otherwise meet the plain and ordinary meaning of these terms, there is no clash whatsoever."  Tr. at 30:24-31:1.  Netflix reemphasized the phrase "presentation data" and noted that using the phrase "data *indicative of* the first collection of presentations so as to be *associated with* the presentation data" would lose meaning if it could simply refer to the presentation data, *i.e.* the content, itself.  The Court agrees with Netflix. Uniloc's proposal continues to undercut the plain claim language itself and ignore the full import of the phrase "presentation data."  The Court acknowledges Uniloc's position that "presentation data *that represents* content" could be considered somewhat redundant in phrasing under the Court's and Netflix's interpretation.  The Court finds, however, that in the context of the '273 Patent, the applicant was signaling with this phrasing that presentation data "represents," *i.e.* "is," the content itself.

Regarding the term "data indicative of the first collection of presentations so as to be associated with the presentation data," however, the Court disagrees with Netflix's proposed construction.  The technical word "metadata" does not appear anywhere in the patent specification.  It is unclear how introducing this word into a construction for this claim phrase would assist a fact finder in understanding the scope of the phrase.  The parties' briefing itself suggests potential disagreement over the scope of the term "metadata," including whether it would cover "information such as file location data."  *Compare* Docket No. 101 at 9 *with* Docket No. 100 at 8.  It is impossible to tell whether the parties have an actual dispute regarding the

scope of this claim term when Netflix is creating a "quibble" (Docket No. 101 at 8) by proposing the introduction of technical words of unknown scope into its proposed claim constructions. Ultimately, the Court gets the impression that Netflix is improperly attempting to limit the scope of this claim term, and that attempt is rejected at this time.

The terms "presentation data that represents content of a first collection of . . . presentations" and "data representing content of the second collection of presentations" are construed as "the data, or a portion of the data, of the audiovisual content itself within the first / second collection of presentations." The term "data indicative of the first collection of presentations so as to be associated with the presentation data" is not construed.

5. "feed" ('273 Patent, Claims 1, 2)

| Uniloc's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| "a channel of automatically and periodically updated digital information" | "a document that utilizes a standardized format (*e.g.*, RSS) to syndicate published Internet content" |

The parties dispute the impact of certain statements in the patent specification on the meaning of the claim term "feed." The patent specification states,

> Syndication of Internet content is becoming more commonplace. Really Simple Syndication ("RSS") is a family of Internet feed formats used to publish content that may be frequently updated, such as podcasts (RSS 2.0). RSS utilizes standardized format. An RSS document (sometimes referred to as a "feed," "web feed," or "channel,") typically contains either a summary of content from an associated web site or the full text.
>
> An RSS may itself be used to aggregate content from multiple web sources in one place. RSS content is typically accessed using an RSS reader application . . . . RSS feeds may typically be subscribed to by entering or selecting the feed's link using the reader. The RSS reader typically checks the user's subscribed feeds for new content at predetermined intervals, downloads updates, and provides a user interface to monitor and view the feeds.
>
> Embodiments of the present invention will be discussed with regard to RSS 2.0 feeds for non-limiting purposes of explanation only. It should be recognized that embodiments of the present invention may be suitable for use with other types of content (e.g., audio/video) feeds.

'273 Patent at 10:63-11:19.

Aside from differences in the phrasing of their constructions, the parties responsive claim construction briefs appear to have narrowed their disagreements to two primary substantive

21

disputes regarding the meaning of the term "feed."  First, the parties dispute whether a feed is more aptly described as a "channel" or a "document."  Second, the parties dispute whether a feed in the context of the '273 Patent requires a standardized format applied to public, Internet-based content.  Otherwise, Netflix introduces the technical phrase "*syndicate* published Internet content" into its proposed construction, as opposed to Uniloc's proposed phrase "*automatically and periodically updated* digital information."

Netflix argues that the specification excerpts quoted *supra* "uses the term 'channel' as another name for an RSS document, not to describe a generic source of digital information."  Docket No. 101 at 9.  Netflix concedes, however, that the term "feed" is not limited solely to the RSS family of feed formats.  That the patent describes RSS feeds as taking the form of a document does not necessarily provide information regarding whether other non-RSS feeds do the same.  On the other hand, the distinction between the technical meaning of the term "channel" compared to the claim term "feed" is not clear to the Court, and it is not clear that a jury would better understand the meaning of the term "feed" by swapping in the term "channel."

Netflix also has not identified clear statements in the intrinsic record showing that the patent applicant intended to limit the meaning of the term "feed" as solely referring to (1) feeds in standardized formats for (2) public, published Internet content.  Although Netflix argues that the specification's references to the RSS family of feed formats suggests that the patent applicant contemplated "feed" to only refer to RSS and similar formats (Docket No. 101 at 10), the specification is clear that references to RSS feeds are non-limiting.  '273 Patent at 11:16-19.  Netflix challenges Uniloc's proposal's reference to "digital information" and argues that it would be improper both in light of the prosecution history and arguments Uniloc made in this case with respect to the parties' § 101 dispute for a feed to "encompass 'digital information.'"  Docket No. 101 at 9, 10.  It is not clear to the Court that Uniloc is arguing that a feed *is* simply "digital information" in the way Netflix has appeared to characterize it.  Netflix does not otherwise defend its position that a feed can only be applied to published Internet content, and the Court does not see a basis in the intrinsic record to so limit it.

At the hearing, the Court issued a tentative ruling that proposed construing the term "feed."  The Court's proposal did not aim to limit the meaning of the term beyond it plain meaning.  Instead, the Court attempted to capture the plain meaning in words and phrases more

likely to be understood by a jury.[4]   At the hearing, both parties stated their position that the Court's proposal would exclude preferred embodiments for the term "feed" either because (1) RSS feeds cannot necessarily "publish to a user automatically" and/or (2) the claims specifically require that certain feeds do not contain the content itself, just links or metadata reflecting content.   Tr. at 19:25, 21:11-17; *see also id.* at 20:1-2 ("An RSS 2.0 document just sits on a server until the reader retrieves it.").   Netflix declined to offer an alternative proposal to the Court's proposed construction.   This is despite the fact that Netflix otherwise failed to provide a basis for using the words "document" or "syndicate" in its proposal, even with the tentative ruling's explicitly expressed concerns regarding using those words in a construciton.   Netflix continued to urge its position that the problem addressed by the '273 Patent relied on using RSS and similar feed formats to sift through the vast amount of Internet content and identify content of interest.   *See* Tr. 21:3-10.   But Netflix did not explain how a proprietary non-standard feed would necessarily fail to also accomplish those goals.   Uniloc provided an alternative proposal to the tentative ruling's proposed construction: "a format used to automatically and periodically provide a user with information about content."[5]   It further reiterated its position that the claim term "feed" should include "non-standard feed format[s] that may be used by a proprietary platform."   Tr. at 22:19-21; *see also id.* at 22:21-23:12.

On the current record and at this time, the Court rejects Netflix's proposal to limit the meaning of the term "feed" to apply to only (1) a standardized format (2) for publishing Internet content.   Having explicitly rejected Netflix's bid to *limit* the meaning of the term "feed" on these two bases, the Court finds that construction of the term "feed" at this time and on the current record is not necessary and would not aid a juror.

6.   "macroblock" ('229 Patent, Claims 1-4)

| Plaintiff's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| "a block of image pixels grouped together for encoding and decoding, such as a 16x16 | "a block of 16 x 16 pixels" |

---

[4] The Court proposed construing "feed" as "a format for providing a user with information about content, which may be used to aggregate content, and which automatically and periodically publishes a summary of the content or the content itself to the user."

[5] Netflix objected to Uniloc's proposal for various reasons, including based on its breadth and also as rendering superfluous certain language in the claims themselves already reflecting the "automatically and periodically" concepts.

| pixel block" | |
|---|---|

The parties dispute whether the term "macroblock" as used in the '229 Patent is limited as referring to a block of 16x16 pixels, or could also include blocks with different numbers of grouped pixels.

The very short patent specification consistently refers to a macroblock in terms of 16x16 pixels. *See* '229 Patent at 1:30-31, 2:5-6, 2:42-44. The patent specification does not necessarily disparage other sizes of macroblocks or state that it is necessarily limited to 16x16 pixel macroblocks. However, Uniloc's argument that the patent specification, by referencing 16x16 pixel macroblocks, suggests that other-sized macroblocks exist and could be used is not particularly persuasive. *See* Docket No. 100 at 3.

The parties' arguments heavily focus on the relevance of extrinsic evidence to support their competing positions. Netflix argues that

> the video coding standards that a POSA would consider the best extrinsic evidence, further supports [Netflix'] construction. Every single major video coding standard adopted in the 1990s, including the 'widely accepted' MPEG standards referenced in Uniloc's complaint (Dkt. 22 at ¶ 20), defined a "macroblock" as including 16 x 16 pixels of luminance.

Docket No. 101 at 1 (citing Declaration of Aggelos K. Katsaggelos in Support of Netflix' Opening Claim Construction Brief, Docket No. 93-2 at ¶¶ 15-22). Netflix also discounts Uniloc's cited extrinsic evidence as outdated and obscure. *Id.* at 2. Netflix notes that adopting Uniloc's proposal would place no limits on the minimum size of a macroblock, arguing that it would "strain[ ] credulity" that the term could cover something as small as a pair of neighboring pixels. *Id.* at 1.

Uniloc's primary argument in its responsive claim construction brief is to point out that the MPEG standards Netflix relies on refer to smaller 8 x 8 pixel-sized blocks of "chrominance" as being combined to form a 16 x 16 luminance block. Uniloc states,

> [w]hen used in the context of Cb or Cr chrominance, a MPEG macroblock is 8x8 pixels, and when used in terms of luminance, it is a MPEG macroblock of 16x16 pixels . . . . The claims of the '229 patent do not specify macroblocks as either luminance or chrominance, and therefore, even if the claims were limited to MPEG (they are not), the size of a macroblock would not be limited to [ ] 16x16 pixels.

Docket No. 100 at 4. At the hearing, Uniloc further argued that certain South Korean references

it cited and that Netflix labeled "obscure" were highly relevant.  *See* Docket Nos. 92-6, 92-9.
Uniloc observed that the '229 Patent claims priority to a 1999 Korean patent application and
includes three named inventors from Korea.   One of the South Korean reference describes
conducting "a variable block size (VBS) motion estimation technique" involving macroblocks
ranging in size from 8 x 8 pixels upwards to blocks of size 32 x 32.  *See* Docket No. 92-9 at
Introduction, 4.  The other discussed video sequence coding with macroblocks up to 32 x 16 in
size.  Docket No. 92-6 at 2.  Uniloc also conceded that "the only evidence that [Uniloc has] is 8 x
8 and higher."  Tr. at 39:16.

Having considered the evidence presented, the Court is persuaded that it would be
inappropriate to limit the meaning of "macroblock" solely to blocks of 16 x 16 pixels at this
time.  However, there appears to be a basis, including based on Uniloc's concession at the
hearing, to set a lower limit on the number of blocks included in the meaning of the term
"macroblock."

The term "macroblock" is construed as "a block of 8 x 8 or more image pixels."

7.  <u>dividing . . . in a macroblock-by-macroblock basis" ('229 Patent, Claims 1, 2)</u>

| Plaintiff's Proposed Construction | Netflix's Proposed Construction |
|---|---|
| Plain meaning | "dividing into regions that are defined as one or more macroblocks" |

Claims 1 and 2 of the '229 Patent state, *inter alia*:

1.  A method, for use in an macroblock-based object oriented coding of a
image signal, wherein the image signal has a stationary background region
and an object region and contains a current frame and a previous frame,
each frame including a plurality of macroblocks, comprising the steps of:
   a) ***dividing the stationary background region and the object region
   from an inputted video in a macroblock-by-macroblock basis*** by
   using a difference between the previous frame and the current frame
   . . . .

2.  The method as recited in claim 1, wherein the step a) ***includes the step
of dividing all macro-blocks as*** the stationary background region and the
moving object region, or foreground object regions and background regions
by comparing test statistics which is a difference between the pixel value of
the macroblock of the current frame and that of the macroblock of the
previous frame in the same position, with the predetermined threshold value.

'229 Patent at Claims 1, 2.  The parties dispute whether the phrase "in a macroblock-by-
macroblock basis" modifies the word "dividing," as Netflix argues, or modifies the word

"inputted video," as Uniloc argues.  As a matter of general grammar, the Court agrees with Netflix that "in a macroblock-by-macroblock basis" is better interpreted as describing how the stationary background region and object region are divided.  Further, Claim 2 of the '229 Patent further describes Claim 1's "dividing" step and specifically requires dividing macroblocks into different "regions" by calculating a "difference between the pixel value of the macroblock of the current frame and that of the macroblock of the previous frame in the same position."  These requirements support that the "in a macroblock-by-macroblock basis" refers to how the inputted video is divided.

Uniloc argues that the specification supports its position that "video is inputted in a macroblock-by-macroblock basis" where it states, "[t]he input image or video signal includes a plurality of video frames and each frame includes a multiplicity of macro-blocks, each macroblock having 16x16 pixels." '229 Patent at 2:42-44.  Whether or not this disclosure indeed supports that video is inputted in a macroblock-by-macroblock basis, it is insufficient to support broadening the claims such that the claimed "dividing" need not occur on a macroblock-by-macroblock basis.  The claim language itself, including Claim 2, supports Netflix's position.  *See also* Docket No. 92 at 8 (Uniloc's opening claim construction brief, describing the '229 Patent by stating, "[t]he method codes the shape information of each region with the help of dividing a video not by pixel unit but by macroblock-unit . . .").

The term "dividing the stationary background region and the object region from an inputted video in a macroblock-by-macroblock basis" is construed as "the stationary background region and the object region from an inputted video are divided on a macroblock-by-macroblock basis."

## V.   <u>Conclusion</u>

For the reasons stated, the Court would construe the disputed terms as follows:

| Term | Court's Construction |
|---|---|
| "resynchronization marker" ('118 Patent, Claim 1) | "sequence of bits in a data stream that can serve as a resynchronization point and an reconstruction point of excluded macroblock(s) for all modes of coding" |
| Alleged disclaimer in '118 Patent specification at column 4, lines 47-65 | *See* construction of "resynchronization marker" |
| "computer system" ('609 Patent, Claim 1) | No construction |
| "each stored data is together indicative of a cumulative time the corresponding web page | "there are two or more stored data that are indicative of a cumulative time the |

| | |
|---|---|
| was displayed by the user's computer" ('609 Patent, Claim 1) | corresponding web page was displayed by the user's computer" |
| "presentation data that represents content of a first collection of . . . presentations" / "data representing content of the second collection of presentations" ('273 Patent, Claims 1, 2) | "the data, or a portion of the data, of the audiovisual content itself within the first / second collection of presentations" |
| "data indicative of the first collection of presentations so as to be associated with the presentation data" ('273 Patent, Claim 1, 2) | No construction |
| "feed" ('273 Patent, Claims 1, 2) | No construction |
| "macroblock" ('229 Patent, Claims 1-4) | "a block of 8 x 8 or more image pixels" |
| "dividing . . . in a macroblock-by-macroblock basis" ('229 Patent, Claims 1, 2) | "the stationary background region and the object region from an inputted video are divided on a macroblock-by-macroblock basis" |